**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| TAMARA MARTIN, | : | Case No. 3:17-cv-279 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

### I.    <u>Introduction</u>

Plaintiff Tamara Martin brings this case challenging the Social Security Administration's denial of her applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. She applied for benefits on May 16, 2014 and October 8, 2014, respectively, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II.  Background

Plaintiff asserts that she has been under a "disability" beginning December 15, 2011. She was forty-six years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). At the time of the ALJ's decision, she was fifty years old and is thus considered a person "closely approaching advanced age." *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). She has a high school education. *See* 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).[2]

### A.  Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that she has kyphosis."[3] (Doc. #6, *PageID* #84). Additionally, she is missing discs in her upper back and has "no cushion" between her tailbone and her hip bone. *Id.* She "can physically hear them grind at some … points." *Id.* She has pain "all over her back." *Id.* On a scale from one to ten, her pain—on average—ranges between eight and twenty. *Id.* The pain in her back is sharp and aching, and she has numbing and pain down her legs as well. *Id.* at 84-85.

She has tried several treatments for her back pain. Injections helped for about a week, but when they wore off, the pain was "twice as bad as it was before … the shot."

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

[3] "Kyphosis is an exaggerated, forward rounding of the back." *Kyphosis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/kyphosis/symptoms-causes/syc-20374205 (last visited June 22, 2018).

*Id.* at 85.  She had not had a shot since November 2015 because of difficulties with her insurance.  *Id.*  Plaintiff tried physical therapy for six to eight weeks but she stopped because "it just causes more pain."  *Id.* at 85-86.  She "occasionally" uses a TENS unit. *Id.* at 86.  Unfortunately, when she uses it, it causes her pulse rate to increase and "then I get anxious and freak out like I'm going to die."  *Id.*  With her boyfriend's help, she tries to use it at different levels so that her pulse will not increase.  *Id.*  Nonetheless, she is scared to use it.  *Id.*

Plaintiff has COPD.  *Id.* at 87.  It causes her shortness of breath every day and, when she gets anxious, it gets worse.  *Id.* at 88.  When she walks from her garage to her house, she loses her breath.  *Id.*  She has two inhalers.  *Id.*  She uses one, Combivent, every day.  *Id.* at 88-89.  She has to use the rescue inhaler at least once per day and sometimes two to three times per day.  *Id.* at 103.  She has a nebulizer machine with two different medications that she is supposed to use three times a day.  *Id.* at 89.  She generally only uses it in the morning because it makes her lightheaded, and with her other medications, it makes her feel like she is drunk.  *Id.*  Respiratory irritants such as dust, smoke and smells cause her to cough; sometimes, she coughs so hard that it hurts her lungs.  *Id.* at 89.  She used to smoke two packs of cigarettes per day but she has cut back significantly to less than half a pack per day.  *Id.* at 90.  She is trying to quit.  *Id.*

Plaintiff gets migraines four or five times a month.  *Id.* at 99.  If she does not take her medication quickly enough, they last all day.  *Id.*  If she does take it in time, her migraines usually last an hour.  *Id.*  Her migraines are "very debilitating."  *Id.*  She usually lies on the sofa with something over her eyes to block out the light.  *Id.* at 100.

3

Plaintiff has a history of bipolar disorder. *Id.* at 91. She has "lots of mood swings, mostly anger." *Id.* She gets angry with everyone and screams at people. *Id.* She argues with and snaps at her boyfriend, sons, daughter, sister, and aunt. *Id.* at 92. She has "been terminated for [her] attitude more than once"—indeed, three of four times. *Id.* at 92-93. The same thing happened each time: she disagrees with something her boss says, gets into a heated discussion, tells her boss to "screw off," and is fired. *Id.* at 93. She gets irritated when she goes into public and does not like crowds. *Id.* at 96. When she goes to the grocery, she "run[s] off the mouth. [She] get[s] told to shut up a lot …." *Id.* Plaintiff has one best friend. *Id.* at 97. She lives in another state, and Plaintiff speculated that if she lived next door, they "probably wouldn't be friends anymore …." *Id.*

She also has some depression. *Id.* at 93. She gets sad often and cries one or two times per day. *Id.* at 93-94. She has anxiety attacks more than once per day. *Id.* at 95. During the attacks, she has chest pain and her heart races. *Id.* at 95-96. They are sometimes so severe that she goes to the hospital because she thinks that she is having a heart attack. *Id.* at 95. Other times, while she is having an attack, she needs someone else, like her boyfriend or sister, to help her calm down. *Id.* There is nothing in particular that causes the attacks. *Id.* at 96.

She constantly has racing thoughts: "my brain never stops. It never stops. Not even to sleep." *Id.* at 94. She usually can only sleep for three to five hours per night. *Id.* And she cannot nap during the day. *Id.* She tried medication to help her sleep but then it causes her to sleep all day. *Id.* at 94-95.

Plaintiff is very easily distracted and has a difficult time staying on task. *Id.* at 102. When she starts something, she usually walks away eventually to start something else and never finishes the first thing she started. *Id.*

Plaintiff estimated that she can sit for approximately an hour. *Id.* at 87. She can stand for fifteen to twenty minutes but it is painful for her. *Id.* She cannot walk very far because she cannot breathe. *Id.* She can walk for about one-hundred yards before she has to sit down." *Id.* at 97. She is not able to lift very much without pain. *Id.* If she picks up a full coffee pot, it causes pain in her lower back. *Id.*

On an ordinary day, she spends most of her time sitting around. *Id.* at 98. She babysits her son's dog, watches TV, and gets on her computer and phone. *Id.* She estimated that she spends seventy-five percent of time on the couch. *Id.* at 101-02.

If she takes all of her medications—gabapentin, ibuprofen, and a muscle relaxer— and does not go to sleep, then she has a low-pain day. *Id.* at 100. On "low pain days," Plaintiff is able to do some household chores but they are still very tiring. *Id.* at 98, 100. She can vacuum and wash dishes—but she has to do them in shifts with breaks in between. *Id.* at 98. She does not have low-pain days very often. *Id.* at 100. On high-pain days, she is "lucky to get a cup of coffee" because it hurts when she picks up the coffeepot. *Id.* at 101. Then she will spend the rest of the day on the couch. *Id.*

Plaintiff lives in a house with her boyfriend. *Id.* at 79. She has a driver's license and is able to drive for about forty-five minutes at a time and then she has to stop and take a break because of the pain. *Id.* at 79-80.

Since December 2011, she has only worked—answering the phone—for her boyfriend's business. *Id.* at 82. She worked for about a year and a half, and she stopped working in January 2016 when he closed the business. *Id.* at 83. She never received a paycheck but he paid some of her bills. *Id.*

Plaintiff testified that she is a college graduate and is also attending college online to get a bachelor's degree in communications. *Id.* at 80. She takes one class per semester and spends about two hours per week on her schoolwork. *Id.* at 81. When Plaintiff tried to take two classes, "it was too confusing for [her] to keep track of both classes at the same time." *Id.* Her grades are "about a C average." *Id.* She is able to focus better with online classes because she does not have a teacher or classroom and she is able to read whenever she wants. *Id.* at 81-82. When her instructors criticize her assignments, she gets frustrated and has "gotten out of line with that a couple times." *Id.* at 82.

### B. Medical Opinions

#### i. Warren C. Morris, M.D.

Dr. Morris, Plaintiff's treating physician, completed a medical impairment questionnaire on July 7, 2015. *Id.* at 642. He indicated that Plaintiff's medical history includes chronic shortness of breath, frequent migraines, recent pneumonia, and chronic back pain with radicular signs. *Id.* He diagnosed COPD, back pain, and migraines. *Id.* Plaintiff's pain is moderate to severe. *Id.* at 643.

Dr. Morris opined that Plaintiff could stand for thirty minutes at one time, sit for two hours at one time, and work for two hours per day. *Id.* at 642. She could occasionally lift five pounds; occasionally bend and balance; and never stoop or raise her

arms over shoulder level.  *Id.* at 642-43.  He concluded that she is not able to perform full-time, competitive work over a sustained basis without missing work more than two times per month or being off task more than fifteen percent of the workday due to her impairments, medical appointments, and/or her medical treatment.  *Id.* at 643.

ii.     *Babatunde T. Onamusi, M.D.*

On April 8, 2013, Dr. Onamusi evaluated Plaintiff and assessed: "1. Chronic back pain, probably secondary to degenerative disc disease with moderate degree of thoracic kyphosis[;] 2. Report of chronic obstructive pulmonary disease with no objective findings on today's examination."  *Id.* at 471-77.  He opined that Plaintiff "is currently capable of engaging in sedentary to light physical demand level activities …."  *Id.*

iii.    *Mary Ann Jones, Ph.D*

On September 15, 2011, Dr. Jones evaluated Plaintiff.  *Id.* at 698-704.  Plaintiff reported to Dr. Jones that her mental health was poor, she suffers from anxiety, depression, anger, and irritability, and she has difficulties with her short-term memory.  *Id.* at 700.  Further, she has difficulty sleeping because of her pain and racing thoughts.  *Id.* at 702.  Dr. Jones noted that Plaintiff had a tendency to "ramble on and on" and her thought association was "very circumstantial."  *Id.* at 700.  In addition, Plaintiff's demeanor was resigned and dysphoric, her affect was sad, she maintained limited eye contact, and she presented as preoccupied with her own symptomology.  *Id.* at 701.

Dr. Jones diagnosed pain disorder and bipolar disorder.  *Id.* at 703.  She opined Plaintiff "could understand and apply instructions in a work setting consistent with …" an average to low-average range of intelligence.  *Id.*  She concluded, "there does appear

to be some limitations in her ability to respond consistently [and] appropriately to common workplace stressors." *Id.*

       iv.    *Alan R. Boerger, Ph.D.*

Dr. Boerger evaluated Plaintiff twice—first, on April 10, 2013 and then again on July 14, 2014. *Id.* at 464-69, 522-27. In 2013, Dr. Boerger noted that Plaintiff's speech was "mildly pressured." *Id.* at 466. Her affect was positive and "she tended to relate in a somewhat joking manner." *Id.* at 467. She indicated that she does not have a problem with depression, anxiety, or panic attacks. *Id.* But, she does have trouble falling asleep at night because she "worr[ies] about everything and can't shut [her] mind off." *Id.* She reported that she does not trust anyone except her boyfriend. *Id.*

Dr. Boerger diagnosed bipolar disorder, not otherwise specified (NOS). *Id.* at 468. He indicated that Plaintiff "had a tendency to get bored and frustrated with work situations and then to quit her jobs. This low frustration tolerance may result in difficulty tolerating work pressures in a work setting." *Id.* at 469. Further, "Because of the longstanding nature of [Plaintiff's] emotional difficulties along with current situation stressors to include not working and health problems, symptoms are likely to continue for the indefinite future." *Id.* at 468.

Dr. Boerger's next report in 2014 revealed changes in Plaintiff's mental health. Plaintiff reported that she may have some problems with depression; she cries all the time; she experiences panic attacks a couple times a week and has had to go to the hospital at times because of them; her "short-term memory has gone to hell in a handcart"; she has trouble staying focused; and she still has trouble sleeping. *Id.* at 524.

Dr. Boerger noted that she was "very verbal and [her] speech was pressured." *Id.* at 525. And, she appeared "somewhat preoccupied with her physical problems." *Id.*

Dr. Boerger diagnosed bipolar disorder, NOS, attention-deficit/hyperactivity disorder, and anxiety disorder, NOS. *Id.* at 526. He opined that although Plaintiff appeared to be capable of understanding instructions, she may have difficulty retaining instructions because she "does appear easily stimulated by outside distractions and may have difficulty staying on task in work situations." *Id.* at 527. He also noted that while she related with him in an appropriate manner, she "does appear to have a pattern of being impulsive in relationships with others and may have difficulty exercising restraint in expressing her opinions in an appropriate fashion." *Id.* He concluded that her "anxiety and low frustration tolerance are likely to reduce her ability to tolerate work pressures in a work setting." *Id.*

   *v.*  *Michael W. Firmin, Ph.D.*

On June 26, 2014, Dr. Firmin evaluated Plaintiff and completed a mental functional capacity assessment. *Id.* at 545-56. He opined that she was moderately limited in her ability to understand, remember, and carry out detailed instructions and respond appropriately to changes in a work setting. *Id.* at 545. She was markedly limited in several categories including, for example, her ability to maintain attention and concentration for extended periods, interact appropriately with the general public, get along with coworkers without distracting them or exhibiting behavioral extremes, and travel to unfamiliar places or use public transportation. *Id.* When asked if Plaintiff was

employable, Dr. Firmin indicated "deferred.  Sustainability would be an issue [with] her anger issues."  *Id*.

Dr. Firmin noted, "she exhibited mental health symptoms during this particular clinical interview that seemingly might interfere with work-related activities because of having anxiety, distractibility, excessive talking, lack of focus, and impatience."  *Id.* at 548.  Her mood was nervous and pessimistic and her facial expressions were sad and anxious.  *Id.* at 548-49.  She "showed outward anxiety manifestations of excessive talking, lack of focus, and nail biting."  *Id.* at 549.

Dr. Firmin diagnosed bipolar I disorder, most recent episode manic, moderate; generalized anxiety disorder, and intermittent explosive disorder.  *Id.* at 550.  He opined that "few current intellectual limitations are suggested for [Plaintiff's] general workplace performance.  As such, she seemingly possesses the ability to learn various specialized job-related tasks."  *Id.* at 551.  Plaintiff "tracked conversation relevantly" during the exam but she was distracted by occasional minor sounds.  *Id.* at 552.  She reported that she had trouble with coworkers and supervisors in the past.  *Id*.  He noted, "Mental health issues impacted previous work via difficulties caused by having temper issues at work, talking too much when feeling manic, and having called in sick at times due to depression."  *Id*.  He further observed that she "showed some particular difficulty in responding appropriately to the stress of the present clinical interview.  She talked constantly … and frequently required redirection in order to answer the clinical interview question."  *Id*.

vi.     *Leslie Rudy, Ph.D., Larry Kravitz, Psy.D., & Denise Rabold, Ph.D.*

Dr. Rudy reviewed Plaintiff's records on April 23, 2013 in connection with Plaintiff's previous application for Social Security benefits. *Id.* at 114-28. She found that Plaintiff had two severe impairments—spine disorders and affective disorders—and one non-severe impairment—COPD. *Id.* at 121. Dr. Rudy opined that Plaintiff has a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* "Due to her bipolar [disorder], [Plaintiff] would be limited to superficial contact with coworkers, supervisors and the general public." *Id.* at 125. Further, she would be "limited to a static environment where any changes in routine could be adequately explained." *Id.* at 126.

On July 21, 2014, Dr. Kravitz reviewed Plaintiff's records and found that she had five severe impairments: disorders of back-discogenic and degenerative; COPD, affective disorders, anxiety disorders, and ADD/ADHD. *Id.* at 130-46. He agreed with most of Dr. Rudy's assessment but added some additional restrictions. Dr. Kravitz opined that Plaintiff "is capable of understanding, remembering and carrying out simple and some detailed instructions." *Id.* at 143. Her "anxiety and avoidance of social contact would make involved interpersonal exchanges difficult …." *Id.* Accordingly, she is limited to "primarily brief and superficial workplace contacts" and "would do best in an environment "where supervisory contact was mainly task focused and assignment directed"; where her contact with the public and coworkers is limited; and "where she could complete tasks relatively independently[] with minimal interaction/distraction by

others." *Id.* Further, because Plaintiff "can become easily overwhelmed and frustrated, with increased anxiety symptoms," her "work routine should have only limited changes, with no high or unpredictable levels of work stress." *Id.*

Dr. Rabold reviewed Plaintiffs records on December 12, 2014 and affirmed most of Dr. Kravitz's assessment. *Id.* at 148-63. Dr. Rabold opined Plaintiff is limited to a work environment with no fast pace or high production rates. *Id.* at 159. Additionally, she should have no contact with the public. *Id.* at 160.

### vii. *Diane Manos, M.D., Michael Delphia, M.D., & Eli Perencevich, D.O.*

On April 23, 2013, Dr. Manos reviewed Plaintiff's records in connection with her previous application for benefits. *Id.* at 114-28. She opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for a total of six hours in an eight-hour day, and sit for six hours. *Id.* at 123. She could occasionally climb ladders, ropes, or scaffolds and frequently climb ramps or stairs. *Id.* at 124. She could frequently balance, stoop, kneel, crouch, or crawl. *Id.* Dr. Manos concluded that Plaintiff was not under a disability. *Id.* at 128.

Dr. Delphia reviewed Plaintiff's records on July 10, 2014. *Id.* at 130-46. He affirmed most of Dr. Manos's assessment. *Id.* However, he concluded that Plaintiff did not have any limitations balancing, kneeling, or climbing ramps or stairs. *Id.* at 140. Further, Plaintiff could crawl occasionally and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. *Id.* at 140-41.

On December 2, 2014, Dr. Perencevich reviewed Plaintiff's records and affirmed Dr. Delphia's assessment. *Id.* at 148-63. He did, however, add one additional limitation:

Plaintiff should avoid concentrated exposure to hazards such as machinery or heights. *Id.* at 158.

## III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's applications for benefits.  He did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since May 1, 2013.

Step 2:    She has the severe impairments of chronic obstructive pulmonary disease; degenerative disc disease of the thoracic spine and lumbosacral spine; a history of migraine headaches; a bipolar disorder; depression; and anxiety.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations: (1) occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no concentrated exposure to temperature extremes or respiratory irritants; (5) limited to performing unskilled, simple, repetitive tasks; (6) occasional contact with co-workers and supervisors; (7) no public contact; (8) no teamwork or tandem tasks; (9) no fast paced production work or jobs which involve strict production quotas; and (10) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next."

Step 4:     She is unable to perform any of her past relevant work.

Step 5:     She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 54-64).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 64.

## V.     Discussion

Plaintiff contends that the ALJ failed to adequately weigh the medical opinions. She also argues that the ALJ erred in finding that she was not credible and in applying administrative res judicata and collateral estoppel.  The Commissioner maintains that the ALJ properly evaluated the medical opinion evidence and Plaintiff's subjective complaints.  Further, the ALJ properly applied res judicata to Plaintiff's previous application.

### A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

In the present case, ALJ Kenyon observed that Plaintiff's treating physician, Dr. Morris, "reported that [Plaintiff] was disabled from all work activity …." (Doc. #6, *PageID* #60) (citing Exh. 14F [Doc. #6, *PageID* #s 642-43]). The ALJ is correct that Dr. Morris opined Plaintiff could not "perform full-time, competitive work over a sustained

basis without missing work more than 2 times a month or being off task more than 15%

of the work day due to … her impairments, her medical appointments, and/or her medical

treatment[.]" *Id.* at 643. However, the ALJ ignored or overlooked that Dr. Morris

thought Plaintiff could work two hours per day. *Id.* at 642. While two hours of work per

day does not constitute substantial gainful employment, it does indicate that the ALJ

ignored or overlooked a part of Dr. Morris's opinion and that Plaintiff's limitations

(according to Dr. Morris) are not as severe as set forth by the ALJ.

ALJ Kenyon determined that Dr. Morris's opinion that Plaintiff is unable to work

"cannot be given controlling, or even deferential, weight." *Id.* at 60-61. He provided a

couple reasons: "[Dr. Morris] appears to have based this assessment solely upon an

uncritical acceptance of [Plaintiff's] subjective complaints, which are not consistent with

the medical evidence. There are no pulmonary function test results to support Dr.

Morris's contention that [Plaintiff] has serious shortness of breath." *Id.* at 60 (citation

omitted). The ALJ concluded, "As Dr. Morris' medical opinion is not supported by the

medical record and is inconsistent with other medical evidence of record, it is afforded

little weight." *Id.* at 60-61.

Although the ALJ correctly stated the treating physician rule previously in his

decision, he does not does not address the first condition—whether the opinion is well-

supported by medically acceptable clinical and laboratory diagnostic techniques. "For a

medical opinion to be well-supported by medically acceptable clinical and laboratory

diagnostic techniques, it is not necessary that the opinion be fully supported by such

evidence." Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.

ALJ Kenyon very briefly discussed support, noting there are no pulmonary function test results that support Dr. Morris's opinion. But, the absence of one kind of test does not reasonably lead to the conclusion that Dr. Morris's opinion is not well-supported; it merely indicates that his opinion is not supported by that test. *See* Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.

Moreover, the ALJ does not adequately address the second condition of the treating physician rule—whether the opinion is not inconsistent with the other substantial evidence in the case record. The ALJ found that Dr. Morris based his opinion "solely" on Plaintiff's subjective complaints and her complaints are not consistent with medical evidence. However, ALJ Kenyon does not explain—or even suggest—why he assumes Dr. Morris based his opinion *solely* on Plaintiff's subjective complaints. This assumption is unreasonable because Dr. Morris did not indicate in any way that he relied only on Plaintiff's subjective reports and because physicians are trained to both consider and investigate subjective reports as opposed to blindly accepting them on face value. Moreover, the ALJ fails to identify what medical evidence is inconsistent with Dr. Morris's opinion. The ALJ does, however, discuss Plaintiff's subjective statements later in his decision but he does not identify what is inconsistent with Dr. Morris's opinion. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010) ("it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record" in the absence of "some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion" is accorded lesser weight); *Dalton v. Berryhill*, No. 3:16-CV-57, 2017 WL 766908, at *2 (S.D. Ohio Feb. 27, 2017) (Rice,

D.J.) (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)) ("[t]he ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion.").  Further, as discussed above, it is not reasonable for the ALJ to assume that Dr. Morris relied upon Plaintiff's statements alone.

Nonetheless, even if Dr. Morris's opinion is not entitled to controlling weight, the ALJ's job is not complete:  "When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).   "However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding."  *Id*. (citing and quoting parenthetically, Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.")).

Although ALJ Kenyon listed the factors previously in his decision, he does not meaningfully address them in his assessment of Dr. Morris's opinion.

ALJ Kenyon's two reasons for assigning Dr. Morris's opinion little weight do not constitute "good reasons" under the Regulations.  "A failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers,* 486 F.3d at 243).  The Sixth Circuit "has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'"  *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009)

### *Dr. Boerger & Dr. Firmin*

ALJ Kenyon "afforded weight" to Dr. Boerger's assessment and to Dr. Firmin's assessment, "to the extent that it has been incorporated into the above captioned residual functional capacity."  (Doc. #6, *PageID* #60).  But, the ALJ erred by reversing the analysis required.  The correct sequential analysis at Step Four requires the ALJ ground his assessment of residual functional capacity on medical source opinions, not the reverse.  20 C.F.R. § 404.1545(a)(3).  The medical opinions must be weighed before, and as an essential part of, the ALJ's assessment of residual functional capacity.  It was error to the extent the ALJ did the reverse.  Although the Commissioner correctly points out that the ALJ discussed both psychologists' opinions at several other points in his decision, the ALJ failed to address their opinions under any applicable factors.  The Commissioner claims that if the ALJ erred in weighing their opinions, it was harmless because the ALJ "'merely failed to explain why he favored several examining physicians'

opinion over another's. …'"  (Doc. #10, *PageID* #745) (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006)).

The ALJ did not only fail to explain *why* he favored one evaluating psychologist over another; he also failed to state whether he favored one over the other.  There is no indication from the ALJ what their opinions are or to what extent he incorporated them into the residual functional capacity.  This constitutes error:  "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…."  20 C.F.R. § 404.1527(e)(2)(ii).

Interestingly, although Dr. Boerger examined Plaintiff twice, ALJ Kenyon does not discuss the first evaluation.  To understand why requires a little background information.  Plaintiff asserts that her disability began December 15, 2011 and thus the first evaluation—which occurred on April 10, 2013—is relevant to the present case.  The ALJ, however, observing that Plaintiff previously applied for Social Security benefits, was denied on April 30, 2013, and did not appeal, found that "[u]nder the principles of *administrative res judicata* and *collateral estoppel*, the earliest date that [Plaintiff] can be found disabled is May 1, 2013 …."[4]  (Doc. #6, *PageID* #54).  Accordingly, it is likely that the ALJ did not discuss the first opinion because, under his approach, Dr. Boerger's first examination occurred less than one month before Plaintiff's disability start date.

---

[4] Plaintiff asserts that the ALJ erred in applying administrative res judicata and collateral estoppel to the present case because the denial of Plaintiff's previous application was only an "initial determination" and "not the product of a hearing …."  (Doc. #7, *PageID* #720) (citation omitted).

This tactic by the ALJ is illogical. "[T]he Commissioner acknowledges that the ALJ should have discussed the report. However, the error was harmless because the ALJ discussed the July 2014 opinion and the findings were similar." (Doc. #10, *PageID* #746). The Commissioner's claim of harmless error flies in the face of Social Security Ruling 96-6p: "Administrative law judges … are not bound by findings made by State agency or other program physicians and psychologists, but they *may not ignore* these opinions and must explain the weight given to the opinions in their decisions." 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis added).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[5]

### B.    Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

---

[5] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Tamara Martin was under a "disability" within the meaning of the Social Security Act;

3.      This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.      The case be terminated on the Court's docket.

July 9, 2018

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).